**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **KARLA ALEXANDER ex rel. M.A.** ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 13 C 4620 |
| ) | |
| v. ) | Magistrate Judge Daniel G. Martin |
| ) | |
| **CAROLYN COLVIN** ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Karla Alexander filed this action on behalf of her minor son, M.A., seeking review

of a final decision of the Commissioner of Social Security ("Commissioner") that denied

M.A.'s claim for Social Security Income under Title XVI of the Social Security Act. 42

U.S.C. § 1382(c). The parties have consented to have this Court conduct all proceedings

in this case, including an entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c).

For the reasons discussed below, Plaintiff's motion is granted.

## I. Legal Standard

### A.    The Social Security Administration Standard

Prior to 1996, a child was considered disabled if he or she had a physical or mental

impairment that was of comparable severity to one that would disable an adult. 42 U.S.C.

§ 1382c(a)(3)(A) (1994); 20 C.F.R. § 416.924 (1996); *Scott v. Barnhart*, 297 F.3d 589, 593-

94 (7th Cir. 2002). Congress altered this standard under the Personal Responsibility and

Work Opportunity Reconciliation Act ("PRWORA") to require a higher showing by a minor

claimant. *Scott*, 297 F.3d at 594 n.5. A child is considered disabled under PRWORA if

she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations" for a period of at least 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i); *Harris v. Barnhart*, 231 F. Supp.2d 776, 779-80 (N.D. Ill. 2002).

To determine if such an impairment exists, the Social Security Administration ("SSA") has promulgated regulations that limit the familiar five-step process that applies to adults to only three steps. The ALJ must answer three questions: (1) is the child engaged in substantial gainful activity? (2) does the child have a medically determinable impairment that is severe? and, (3) do these impairments meet, medically equal, or (unique to child claimants) functionally equal one of a list of severe impairments set forth in the Listings? 20 C.F.R. § 416.924(b)-(d). An affirmative answer at Step 1 ends the analysis, and a child must be found not to be disabled regardless of his age or medical condition. 20 C.F.R. § 416.924(b). A negative answer at Step 2 also requires a finding that the child is not disabled. 20 C.F.R. § 416.924(c).

Unlike the Step 3 requirements that apply to adults, the regulations state that a child satisfies the third step when her condition "functionally equals" a listed impairment. 20 C.F.R. § 416.924(d). This requirement permits a finding of disability if a child's impairment or combination of impairments results in one of two possible findings. First, the impairments must give rise to "marked" limitations in two of six "domains of functioning," including (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well being. 20 C.F.R. §§ 416.926a(a) & 416.026a(b)(1)(i)-(vi). A limitation is marked if it "interferes seriously" with a child's ability to independently begin, sustain, or finish activities. 20 C.F.R. § 416.926a(e)(2)(i). Such

2

a limitation is "more than moderate" and is equivalent to what one would expect for the functioning level of a child whose standardized test scores are at least two, but less than three, standard deviations below the mean. *Id*.

In the alternative, impairments functionally equal a listed requirement when they constitute an "extreme" limitation in one of the six domains of activity. 20 C.F.R. § 416.92a(a). A limitation is extreme if it "very seriously" interferes with a child's ability to initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation indicates the "worst limitations," though it does not require a complete loss of functioning. It reflects the functioning level expected for a child whose standardized test scores are at least three standard deviations below the mean. *Id.*

**B. Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the

validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott*, 297 F.3d at 595. Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. Background Facts

The sparse record in this case contains documents from treating medical sources, M.A.'s teachers, and an unusually brief administrative hearing.

### A. School and Medical Records

Although M.A. has not been placed in special education, the few schools records available indicate that he struggled significantly in school. M.A.'s report card from the 7th grade shows a B in social studies and computer science. The remaining 18 scores indicate three C's, ten D's, and five F's. (R. 291). His 8th grade report only includes scores from one quarter. Again, they were predominately D's and F's. (R. 290). A report from the sixth grade shows two B's, three C's, four D's, and 13 F's. (R. 293).

Two of M.A.'s teachers issued Teacher Questionnaires that addressed his performance in the six domains of functioning. Math teacher Valerie English found "very serious" problems in eight of 10 areas in M.A.'s domain of acquiring and using information. She noted that he daydreamed in class "a lot" and that he would often "sit and do nothing in class." (R. 234). The domain of attending and completing tasks was almost as problematic. M.A. had serious difficulties in completing class homework assignments. Very serious problems existed in seven of 10 areas, with hourly and daily difficulties existing in all areas. (R. 235). Interacting with others and caring for himself posed serious,

though somewhat less pressing, concerns. Ms. English stated that M.A. felt that he was "picked on" by other children. (R. 238). He was suspended from school for two days in April 2009 for kicking and hitting another student. (R. 204).

English teacher Barbara Vaughan echoed these concerns. She noted that M.A. had been absent from school at least once a week. She believed that he was reading on the second grade level even though M.A. was in the sixth grade at the time of the report. (R. 245). Her assessment of acquiring and using information was somewhat less dire than Ms. English's. However, Ms. Vaughan noted that M.A. never handed in his work when he was left to complete it on his own. "He will sit and stare and claim he is thinking and then hand nothing in at the end." (R. 246). She found more limitations in the domain of attending and completing tasks. Ms. English assessed seven "very serious" and two "serious" problems, each of which arose on a daily basis. She noted that M.A. would "put his head down and claim not to feel good rather than complete a task." (R. 247).

Medically, M.A. suffers from impaired vision. A brain MRI was taken in August 2008 after he complained of headaches and blurred vision. It showed an enlarged right globe and compression of the right optic nerve. (R. 296). Ophthalmologist Dr. Bhagvanji Meghpara diagnosed optic nerve fibrosis and blurred right-eye vision due to trauma during childbirth. (R. 297). Dr. Benjamin Ticho diagnosed legal blindness in the right eye due to myelinated nerve fibers. M.A. had 20/20 vision in his left eye with glasses. (R. 361).

M.A. also suffers from asthma. (R. 362-63). He was prescribed Albuterol, Advair, Singulair, and an oral steroid to treat his symptoms. (R. 364). M.A. additionally experienced numerous sleep-related problems. He underwent a study at the Franciscan St. James Sleep Disorder Center in December 2011. The study indicated mild sleep

apnea and "sleep onset and sleep maintenance insomnia with poor sleep efficiency." (R. 369). Dr. Bampen Charo recommended an ear, nose, and throat examination for possible airway resistence. He also thought that M.A. should be examined for "possible narcolepsy with history of cataplexy, hypnagogic hallucinations without any sleep paralysis." (R. 369). Dr. Champa noted that M.A. had been experiencing fatigue throughout the day "with significant hypersomnia [excessive sleepiness]" that caused him to fall asleep "at inappropriate times." (R. 370). The sleep study showed that M.A. awoke 14 times during the night. (R. 370).

### B.  Medical Expert Evidence

On January 11, 2010, psychologist Dr. Jeffrey Karr examined M.A. and issued a consulting evaluation. M.A. was in the sixth grade at the time. He told Dr. Karr that he got into fights, and that he had failed the third grade. The psychologist did not note any obvious cognitive or physical problems. M.A. appeared to be "alert, responsive and cooperative." However, Dr. Karr believed that M.A. suffered from attention deficit/hyperactivity disorder ("ADHD") based on his academic history and statements given by his mother. (R. 308). Dr. Karr conducted a follow-up evaluation on September 8, 2010. After applying the W.I.S.C.-IV test, Dr. Karr concluded that M.A. had an IQ of 74, giving him only borderline intellectual functioning. He diagnosed a learning disorder NOS (not otherwise specified) based on M.A.'s academic history. (R. 327)

Non-examining state-agency physician Dr. Cose Cagas and psychologist Dr. Lionel Hudspeth issued a childhood disability evaluation in February 2010. They concluded that M.A. suffered from the severe impairments of ADHD, right eye vision problems, and headaches. None of these impairments met, medically equaled, or functionally equaled

6

a listing. The state-agency experts found no limitation in the domain of moving about and manipulating objects. Less than marked limitations were assessed in the five remaining functional domains. (R. 311-16).

State-agency experts Dr. Virgilio Pilapil and Dr. Terry Travis issued another report in September 2010. They found severe impairments of ADHD, high myopia/amblyopia, learning disorder, and borderline intellectual functioning. None of the disorders functionally equaled a listing. These physicians reached the same conclusions as the earlier state-agency physicians concerning restrictions in M.A.'s six functional domains. (R. 331-35).

Medical expert Dr. Milford Schwartz testified at the administrative hearing held on December 1, 2011. His testimony was not entirely clear. Dr. Schwartz did not believe that asthma constituted a severe impairment for M.A., though he went on to find that it did not meet a listing. (R. 22). He also cast doubt on Dr. Karr's diagnosis of a learning disorder. Dr. Schwartz thought that diagnosis could only be based on a "discrepancy between achievement testing and IQ testing," which he said was not present in the record. (R. 20). He also seemed to reject Dr. Karr's diagnosis of ADHD because it was made "by history, which meant that that was report [sic] of symptoms without documentation or observation." (R. 20).

Unlike the state-agency doctors, Dr. Schwartz found that M.A. had a marked limitation in acquiring and using knowledge. A less than marked restriction was present in the domain of attending and completing tasks. No limitation was found for interacting and relating to others. Dr. Schwartz thought that M.A.'s periodic aggression and impulsive behavior might be related to ADHD (which he previously doubted) but found that "there is no really mental MDI [medically determinable impairment] that would account for these

issues." (R. 26). A less than marked restriction was present for moving about and manipulating objects and physical well-bing. (R. 27-28). There was no limitation in the domain of caring for oneself. (R. 28). Finally, Dr. Schwartz noted that no sleep study had been submitted at the time of the administrative hearing. He conceded, however, that a diagnosed sleep disorder could explain M.A.'s problems to such a degree that a mental impairment would not be necessary. (R. 31, "So, yeah, if there's a sleep disorder diagnosed, that might explain some of the symptoms reported which would obviate the need let's say for a mental impairment to be established.").

###    C.    Hearing Testimony

M.A. appeared at the hearing and gave very brief testimony. He stated that he likes to play video games with friends, and that he posts notes on Facebook every other month. He lives alone with his mother. He is able to make simple things like peanut butter sandwiches. He can also microwave tea and cocoa. M.A. has trouble going to sleep at night and sometimes falls asleep in class. (R. 8-11).

M.A.'s mother also testified. She stated that his right eye was "totally gone." (R. 13). M.A. had been suspended two to three times from school during the past year. She described M.A.'s asthma medications, and told Dr. Schwartz that his doctor would update her on the next visit concerning further treatment. Ms. Alexander told the medical expert that M.A. had missed a great deal of school due to nosebleeds and difficulties in breathing. She encouraged him to return home so that he would not "pass out or whatever." (R. 16). M.A.'s mother noted that a school social worker had started working at the school within the last month and would be helping M.A. with his social behavior. (R. 13-18).

### D.   The ALJ's Decision

ALJ Patricia Supergan issued a written decision on February 10, 2012 that was adverse to M.A.  She found at Step 1 that M.A. had not engaged in substantial gainful activity since his application date of April 20, 2009.  M.A.'s severe impairment at Step 2 was limited to right optic nerve dysplasia.  The ALJ determined at Step 3 that no impairment or combination of impairments met or medically equaled a listing.  They also did not functionally equal a listing.  The ALJ concluded that M.A. had a marked limitation in the domain of acquiring and using information.  A less than marked limitation was found in attending and completing tasks, moving about and manipulating objects, and health and physical well-being.  No limitations were found in interacting and relating to others, and caring for oneself.  As part of this analysis, the ALJ found that M.A. and his mother were not credible.  Based on these conclusions, the ALJ found that M.A. was not disabled. (R. 64-76).

### III.   Discussion

Alexander challenges the ALJ's decision on grounds that are not always easily separated from one another.  She claims that the ALJ: (1) failed to consider the reports of M.A.'s teachers, (2) incorrectly assessed M.A.'s and her own credibility, (3) did not properly weigh Dr. Schwartz's or Dr. Karr's testimony,(4) failed to correctly assess the sleep study that was submitted after the hearing, and (5) did not support her findings concerning M.A.'s functional domains.  The Court addresses each of these concerns in turn.

### A.   Credibility

If an ALJ finds that a medical impairment exists that could be expected to produce

a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work.  SSR 96-7p.  The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. The ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion."  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).  Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations.  *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  A court reviews an ALJ's credibility decision with deference and overturns it only when the assessment is patently wrong.  *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

The Court agrees that the ALJ's credibility analysis is erroneous.  She thought that the testimony of both Alexander and M.A. was not credible because the record did not support it.  In reality, the record confirms almost everything they told the ALJ.  M.A.'s testimony was extremely limited.  He told the ALJ that he was failing in some of his classes.  Ms. English and Ms. Vaughan both expressed serious concerns about M.A.'s functioning in school.  As noted above, moreover, his report cards contain predominately D's and F's.  M.A. also described some of his daily activities.  He said that he could microwave tea and cocoa, and that he could make a peanut butter sandwich.  Contrary to her own credibility finding, the ALJ accepted those claims and used them against M.A. for the reasons discussed below.  M.A. further stated that he had trouble sleeping.  That is fully supported by the sleep study report that was submitted after the hearing.  Thus the ALJ failed to identify any of M.A.'s testimony that was contradicted by the record.

The ALJ did not account for most of Alexander's statements at the hearing. In fact, the ALJ attributed comments to Alexander that she never made. The ALJ claimed that the record did not show that M.A. had ever been treated for ADHD "in contrast to . . . his mother's report." (R. 69). But Alexander's disability report never mentioned ADHD. (R. 224-33). Nor did she say anything about it at the hearing. Alexander did describe M.A.'s behavioral problems, but neither the ALJ nor the medical expert asked her anything about ADHD or treatment for it. The limited school records available confirm everything else that M.A.'s mother told the ALJ. She said that M.A. was suspended for aggressive activities. That is true. She said that M.A. missed school because of nosebleeds. Ms. English noted in her report that he was frequently absent because of "nose bleeds!" [sic] and headaches. (R. 239). In addition, the report cards confirm Alexander's statement that M.A. was often absent from school. The 6th grade report shows 22 absences in math, 21 in language arts, and 20 in social studies (in which M.A. received four consecutive F's). (R. 293). The ALJ failed to account for any of this information.

The ALJ seems to have thought that M.A. and his mother were not credible because he had never been placed in special education. However, neither of the witnesses claimed that M.A. was in special education or that he needed it. They merely described the academic problems that are amply confirmed by M.A.'s school records. The ALJ never explained why M.A.'s placement in regular education made him less credible. The issue is not self-evident. The ALJ should have been aware that the regulations require particular attention to the issue of special education before drawing inferences based on a child's educational setting. An ALJ must first take account of the full range of factors involved in the child's school environment. "The fact that you do or do not receive special education

services does not, in itself, establish your actual limitations or abilities. Children are placed in special education settings, *or are included in regular classrooms* (with or without accommodation), for many reasons that may or may not be related to the level of their impairments." 20 C.F.R. § 416.024(a)(7)(iv) (emphasis added). The ALJ in this case gave no attention to this requirement. She never asked M.A. or his mother about his academic placement, his troubling grades, or his many absences from school. She could not draw conclusions concerning M.A.'s credibility or his limitations without first assessing the relevant factors more carefully.

The Commissioner defends the ALJ's credibility analysis on the ground that the record shows that M.A. was not disabled. The Court assumes the government is arguing that remand is not required because nothing that Alexander or M.A. told the ALJ at the hearing would necessitate a finding of disability even if it were credited. *See Schumacher v. Barnhart*, 196 F. Supp.2d 716, 727 (N.D. Ill. 2002) ("Significantly, Claimant has not pointed out any specific testimony at the administrative hearing that, if taken as credible, would substantially contradict the medical record or mandate a finding of disability."). The Court agrees with this claim to some degree. Alexander's and M.A.'s hearing statements were very limited. Other things being equal, the ALJ may have had grounds for reaching her decision even though the record supported what the witnesses told her.

The problem with this position is that the record strongly suggests that all other things are not equal. Many errors exist in the ALJ's decision. Moreover, the medical and school records in this case are unusually sparse. That made the witnesses' testimony, and the ALJ's correct assessment of it, particularly important. The ALJ *said* that M.A.'s testimony was not credible. But it is clear that she actually accepted his statements about

12

his ability to make a sandwich, microwave tea, play video games, post notices on Facebook, and take out the trash. In fact, she cited them as support for her conclusion that M.A. was "functioning in an age appropriate manner." (R. 69). That was critical because a child who can function appropriately compared to non-disabled children his own age is ordinarily deemed not to be disabled. *See* 20 C.F.R. § 416.926(a) (requiring an ALJ to compare a child's functioning to other children his own age who are not impaired). The ALJ never explained her contradictory reasoning. She was not entitled to discount some of his statements, credit others, and remain silent on how she reached such different conclusions.

The Commissioner does not argue that this constitutes harmless error. It is difficult to see how it could in this case. "The only situations in which an error in . . . making a credibility determination can confidently be thought harmless are when a contrary determination would have to be set aside as incredible or when the trier of fact says that he would have made the same determination even if the questioned circumstances had been different from what he thought them to be and he gives an adequate reason for that back-up position." *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). The second of these conditions does not apply because the ALJ never addressed it.

The first condition also fails because a contrary conclusion is far from being incredible. It is very easy to imagine an adjudicator refusing to rely on the fact that a child can make a sandwich and microwave tea to conclude that he is functioning in line with non-disabled children his age. This Court, for one, finds the link between these activities and the ALJ's conclusion tenuous based on her limited exploration of the topic. The same applies to the ALJ's belief that M.A. was functionally normal because he posted items on

Facebook.  She failed to note that he only did so once every other month. It is far from clear why that brings him in line with other children his age.  *Cf.* http://www.pewresearch.org/fact-tank/2014/02/03/6-new-facts-about-facebook ("64% of Facebook users visit the site on a daily basis.") (last visited Feb. 20, 2015).  As for the other factors the ALJ cited, she never asked M.A. or his mother to explain how frequently he carried out his household chores or played video games.

The problems involved with the credibility analysis go beyond what the ALJ said she considered.  The regulations required the ALJ to account for M.A.'s functioning in all of his environments.  "We will look at . . . how your functioning is affected during all of your activities when we decide whether your impairment or combination of impairments functionally equals the listings.  Your activities are everything you do at home, at school, and in your community."  20 C.F.R. § 416.926a(b).  M.A. and his mother gave very little testimony on these topics, in part because the ALJ did not ask them much.  Most of the questions posed to Alexander came from the medical expert.  The ALJ never inquired into how frequently M.A. did any of the daily chores she relied on to deny his disability claim; what his social activities were (other than a stray question as to whether he went to the movies); why he missed school; why he got into altercations; or why he did not complete his school tasks.  The ALJ also never asked Alexander about M.A.'s attention span, even though the ALJ claimed the record contradicted the mother's alleged statements on ADHD.

Given the sparsity of the record, the ALJ should have elicited meaningful statements on the issues and assessed their credibility if she thought that M.A.'s testimony showed that he could function in an age-appropriate manner.  Plaintiff's motion is granted on the credibility issue.

## B.  <u>The Teacher Reports</u>

As discussed above, two of M.A.'s teachers submitted answers to questionnaires that addressed his functioning in ten subcategories for the domains of functioning.  Ms. Vaughan and Ms. English expressed numerous concerns about M.A.'s capacity for acquiring information and completing tasks.  Both teachers thought that he had "serious" or "very serious" problems in virtually all aspects of these domains.  They noted that he was inattentive, could not complete his work, and often stared and daydreamed without asking for help. The ALJ summarized the reports in her decision.   Alexander argues that the ALJ erred by not assigning a specific weight to the reports and by failing to address the content of the teachers' concerns adequately.

The Commissioner claims that the ALJ did not err because SSR 06-3p states that non-medical sources like teachers cannot be used to establish a medically determinable impairment.  That fails to address the issue at hand.  Alexander is not arguing that the ALJ should have relied on Ms. English and Ms. Vaughan to identify M.A.'s medical impairments.  She contends that the ALJ was required to consider these reports properly in order to assess the severity of his functional limitations.  The Court agrees.  Social Security Ruling 06-3p requires an ALJ to use evidence from "other sources" like teachers because their opinions "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."   The Ruling stresses that such sources may even "under certain circumstances[ ] properly be determined to outweigh the opinion from a medical source, including a treating source."  SSR 06-3p.

The Commissioner further claims that the ALJ stated how she assessed the reports.

The Court is unable to discern what that assessment is, other than a general disapproval of the reports. It is true that the ALJ rehashed many of the reports' statements. But merely summarizing a teacher's report is not the same as weighing it or providing reasons to support that weight. *See Hickman ex rel. M.A.H. v. Astrue*, 728 F. Supp.2d 168, 178-79 (N.D.N.Y. 2010) (finding that summarizing a teacher report is not equivalent to assessing the weight it deserves). The government also claims that the ALJ "synthesized" the reports with other evidence. (Resp. at 5). Even if it were clear what that means, the ALJ failed to explain how she considered the teachers in tandem with other evidence. Insofar as she may have credited some of the teachers' statements – and she never said that she had done so – the ALJ did not identify what they were or explain why others were rejected. She certainly did not properly discuss why she did not credit the severe problems that both teachers found in M.A.'s ability to attend and complete tasks.

Social Security Ruling 06-3p states that the ALJ "generally should explain the weight given to the opinions from 'other sources'" like teachers by using all the factors set out in 20 C.F.R. 404.1513(d) that apply to acceptable medical sources. The failure to do so is not always a reason for remand. However, an ALJ's oversight on this matter can be erroneous when the reports contain important contrary evidence, or when it is clear that the educators have special insight into the child's day-to-day functioning. *See Strong ex rel. M.H. v. Astrue*, 2012 WL 6186831, at *10-11 (N.D. Ill. Dec. 12, 2012); *see also Baker ex rel. Baker v. Barnhart*, 410 F. Supp.2d 757, 768 (E.D. Wis. 2005); *Matthews ex rel. Dixon v. Barnhart*, 339 F. Supp.2d 1286, 1291 (N.D. Ala. 2004) ("Teachers and school personnel know how the claimant is functioning on a day-to-day basis compared to other

children of the same age who do not have impairments."); *Lucero ex rel. J.L. v. Astrue*, 2012 WL 1414382, at *6 (D. Colo. March 13, 2012) (remanding so that the ALJ could explain why more weight was given to a medical expert than to a teacher); *Estrada ex rel. J.E. v. Astrue*, 2012 WL 3779917, at *7 (E.D. Wash. Aug. 31, 2012) ("[T]he educators' opinions must be considered and the weight given to them explained."); *Ruiz ex rel. Z.R. v. Astrue*, 2010 WL 5479934, at *6 (N.D. Ohio Nov. 15, 2010) ("The regulations' admonishment for an ALJ to consider the opinions of a child claimant's teachers is not mere lip service.").

That is the case here.  The teachers' reports were the most serious evidence that supported M.A.'s allegations about his problems at school.  They were also based on the most extensive observation of M.A. by anyone other than his mother.  M.A.'s teachers worked with him on a daily basis for approximately three months.  They were unanimous in finding serious problems in his functioning in at least two domains.  Ms. English and Ms. Vaughan were presumably experienced in assessing how M.A.'s functioning compared to that of other non-impaired children.  Social Security Ruling 06-3p stresses that non-medical sources like teachers frequently "have close contact with individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time."  Given the importance of their reports, the ALJ was required to explain in at least minimal form what weight she assigned to them.

The ALJ seems to have thought the teachers' statements about M.A.'s academic performance were not that troubling because his latest report card showed one B and one C.  (R. 69).  That was seriously erroneous.  The same report card also shows D's in health and social studies, and F's in art and science.  (R. 290).  The report cards for the preceding

17

year contain two B's, three C's, ten D's, and five F's. (R. 291). The year prior to that indicates two B's, three C's, four D's, and 13 F's. (R. 293). The ALJ's selective reliance on favorable scores over non-favorable ones amounts to prohibited cherry-picking of evidence. An ALJ may not "select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). *See also Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("[The] ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.") (citation omitted). The ALJ was required to account for the totality of M.A.'s grades instead of relying on two favorable scores. If she thought the higher grades outweighed the far more numerous D's and F's, the ALJ should have stated the reasons that led her to such an unusual conclusion.

The ALJ went on later in her decision to note that the teachers were concerned that M.A. failed to turn in his assigned work, often put his head down in class, and did not ask questions. She dismissed these statements on the inexplicable ground that, despite these daily observations made by M.A.'s teachers, the record "suggests that his inability to perform school work is the reason behind his poor grade[s]." (R. 70). The best that can be said of this reasoning is that it is circular. Unless a child is simply unwilling to work, poor grades are almost always the product of a student's "inability to perform school work." The ALJ's task was to examine the reason for M.A.'s difficulty.

The ALJ stated that she deferred on this issue to Dr. Schwartz's testimony that there was no medical basis for this problem. That was insufficient to explain her reasoning. As discussed below, the ALJ's consideration of Dr. Schwartz's opinion was erroneous in

18

multiple ways, including her belief that he denied any cause for M.A.'s cognitive problems. The Court only notes at this point that if no medically determinable cause existed for M.A.'s limitations, it is very difficult to understand why the ALJ went on to assess what those limitations were. An ALJ is only expected to assign functional domain assessments for an impairment that causes a child's domain limitations. 20 C.F.R. § 416.926a(a) ("We will assess the functional limitations *caused by your impairment(s)*.") (emphasis added). The ALJ's failure to discuss the reports properly requires remand.

### C. The Medical Experts

An ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 404.1527(d). *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."). The regulations lay out six factors an ALJ should consider as part of this analysis, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence. 20 C.F.R. § 404.1527(d)(1)-(6). The ALJ must clearly state the weight he has given to the medical sources and the reasons that support the decision. *See Ridinger v. Astrue*, 589 F. Supp.2d 995, 1006 (N.D. Ill. 2008).

The ALJ found Dr. Schwartz's hearing testimony to be persuasive, though she did not assign a specific weight to it. (R. 70). She gave four reasons for her decision: (1) Dr. Schwartz was a pediatrician, (2) he was familiar with Social Security law, (3) he heard the witnesses' testimony and observed them at the hearing, and (4) the record supported his opinion. The ALJ also gave "some" weight to the state-agency physicians. She thought

that their reports were consistent with the record, albeit not to the degree that Dr. Schwartz's opinion was. The ALJ never identified these experts. The Court assumes she referred to the non-examining physicians Drs. Pilapil, Travis, Cagas, and Hudspeth. The ALJ never evaluated the consulting report of Dr. Karr.[1]

The Court easily concludes that the ALJ's consideration of these matters was erroneous. One key issue involves the ALJ's failure to assess Dr. Karr, whose opinion differed markedly from Dr. Schwartz's. The government contends that no serious conflict exists between the two doctors. In reality, the opposite is true. Dr. Schwartz rejected crucial diagnoses that Dr. Karr made concerning ADHD and a learning impairment. The state-agency experts agreed with him on both accounts. Dr. Schwartz criticized the ADHD finding because Dr. Karr diagnosed it based on M.A.'s history alone. (R. 20, characterizing it as "a report of symptoms without documentation by observation"). He then rejected the learning impairment diagnosis based on the belief that it could only be assessed "by discrepancy between achievement testing and IQ testing." (R. 20). Dr. Schwartz did not see such testing differences in the record.

The ALJ's decision to credit Dr. Schwartz without weighing Dr. Karr was fundamental to her disability finding. Unfortunately, she failed to discuss any of her reasons with sufficient care. The ALJ began by noting that Dr. Schwartz was a

---

[1] The ALJ did not suggest that Dr. Karr fell within the group of "state agency medical consultants' childhood disability evaluations." (R. 71). The ALJ noted that these experts all found that M.A.'s impairment did not meet the functional equivalence standard. She could not have been referring to Dr. Karr as part of that group of experts because he did not assess functional equivalence. Thus the Court concludes that the ALJ did not provide any assessment of Dr. Karr's two reports. The Commissioner does not dispute Alexander's claim that Dr. Karr was hired by the Social Security Administration as a consulting expert.

pediatrician. That speciality was certainly relevant to M.A.'s asthma and right-eye problems. It might well have been relevant to his sleep-related problems. But the ALJ never explained why it was a controlling factor in considering Dr. Schwartz's testimony on critical matters like a learning impairment or ADHD. These impairments involve serious psychological as well as medical issues. Indeed, ADHD is covered by the Diagnostic and Statistical Manual of Mental Disorders.[2] It is also included in the listings as a mental disorder. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.11. Dr. Schwartz himself raised the possibility that a psychologist might bring a different perspective to certain aspects of M.A.'s functioning. (R. 25).

The ALJ failed to address why a pediatrician could provide a more reliable opinion concerning M.A.'s cognitive functioning than Dr. Karr could. Dr. Karr was a psychologist. So was state-agency psychologist Dr. Lionel Hudspeth, who agreed with Dr. Karr that M.A. suffered from ADHD. (R. 311). The ALJ also never said why Dr. Karr's expert diagnostic methodology was suspect. Dr. Karr interviewed M.A. and his mother. *See* http://www.webmd.com/add-adhd/guide/adhd-tests-making-assessment ("Talking with the patient and family members may be the most important diagnostic tool doctors have for ADHD.") (last visited on Feb. 25, 2015). He also reviewed the teacher questionnaires.

---

[2] The DSM-IV includes three subtypes of ADHD. Six findings are required for a diagnosis in children: (1) six or more of a list of symptoms for inattention; (2) six or more symptoms for hyperactivity-impulsivity; (3) some hyperactive-impulsive or inattentive symptoms that cause an impairment and are present before age 7; (4) some impairment from the symptoms that are present in two or more settings; (5) clear evidence of serious limitations in social, academic, or occupational functioning; and (6) symptoms that do not arise only in the course of another mental disorder. *See* Diagnostic and Statistical Manual of Mental Disorders 92-93 (4th ed. 2000). The Fifth Edition of the DSM, which was introduced after the ALJ issued her decision, includes a number of changes to the DSM-IV criteria.

Moreover, the psychological experts were well aware of how the ADHD diagnosis was made, yet they accepted it.[3] If the ALJ thought that Dr. Schwartz's specialization gave him greater authority to comment on the issue, she should have explained why pediatrics made Dr. Schwartz more authoritative than Dr. Karr. What she could not do was to remain silent on the issue and not evaluate Dr. Karr at all. *See David v. Barnhart*, 446 F. Supp.2d 860, 871 (N.D. Ill. 2006) ("The weight given to a . . . physician cannot be implied[.]"); *Thorps v. Astrue*, 873 F. Supp.2d 995, 1005 (N.D. Ill. 2012) ("An ALJ, however, is not only allowed to, he must . . . resolve conflicting medical evidence.").

The ALJ's reliance on the fact that Dr. Schwartz was familiar with the regulations that govern disability analyses is a non-starter. As a state-agency consulting expert, Dr. Karr is also presumed to have been an expert in these issues. So are the non-examining experts who accepted his diagnoses. Social Security Ruling 06-6p states that state-agency "medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." The ALJ never explained why Dr. Schwartz had greater expertise in this area than Dr. Karr.

The fact that Dr. Schwartz observed M.A. at the hearing undermines, rather than

---

[3] The Commissioner argues that Dr. Karr rejected ADHD in his second evaluation of M.A. The evidence is not sufficient to reach that conclusion. Neither party explains why a second evaluation was required. It appears to have been limited to the application of the W.I.S.C.-IV test to assess M.A.'s IQ. Dr. Karr assessed a learning disorder and borderline intellectual functioning. (R. 327). One reasonable interpretation of the second consulting report is that it was designed to supplement the first one with additional diagnoses, rather than to replace it with a new statement of all of M.A.'s diagnoses. That is how the state-agency physicians interpreted it. Dr. Pilapil and Dr. Travis issued their disability evaluation several weeks after Dr. Karr evaluated M.A. for the second time. The state-agency doctors combined his earlier diagnosis of ADHD with the new findings in the second consulting report. (R. 330).

supports, the ALJ's finding that he deserved greater weight on that basis. The ALJ said that M.A. and his mother were not credible. She did not explain why their non-credible testimony gave Dr. Schwartz greater insight than two clinical interviews conducted by Dr. Karr. More importantly, Dr. Schwartz never examined M.A. The regulations advise ALJs that they are required to "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not." 20 C.F.R. § 404.1527(d)(1). *See also Criner v. Barnhart*, 208 F. Supp.2d 937, 954 (N.D. Ill. 2002) ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.") (internal quote and citation omitted). The ALJ never addressed this important issue.

Finally, the ALJ thought that Dr. Schwartz's testimony was well-supported by the record. She failed to explain what part of the record she considered in this respect. Outside of the teachers' reports, the bulk of the record relevant to ADHD and a learning impairment involves opinions of the other medical experts. These reports directly contradict Dr. Schwartz by finding the existence of both ADHD and a learning impairment. The teacher reports reinforce those conclusions. Ms. English noted that M.A. had problems staying focused and that "he will sit and do nothing in class most of the time." (R. 234). He has a "hard time completing class homework assignments because of his lack of understanding." (R. 235). Ms. Vaughan fully concurred. She warned that M.A. never handed in work "if he is left to complete an activity by himself. He will sit and stare and claim that he is thinking and then hand nothing in at the end." (R. 246). The ALJ could not merely refer in broad terms to the record without accounting for the documents that are frequently at odds with Dr. Schwartz. Alexander's motion is granted on the

23

medical expert issue.

**D.     The Sleep Study**

After the administrative hearing, Alexander submitted a sleep study on M.A. carried out by Dr. Bampen Charo at the Franciscan St. James Health Sleep Disorder Clinic.  The study's results are outlined above.  The ALJ concluded that the report indicated mild sleep apnea that constituted a non-severe impairment.  (R. 71).  Alexander argues that this does not address the issue sufficiently because Dr. Schwartz testified that "if there's a sleep disorder diagnosed, that might explain some of the symptoms reported which would obviate the need let's say for a mental impairment to be established."  (R. 31; R. 33, "I think poor sleep would account for it very nicely.").

The Court agrees that the ALJ's discussion of the issue was insufficient.  The sleep disorder that was diagnosed after the hearing met the conditions that Dr. Schwartz outlined in his testimony.  The ALJ only stated that the disorder was non-severe.  That was essentially a Step 2 determination.  She was still obligated to discuss the combined effect of all severe and non-severe impairments.  Social Security Ruling 09-1p states that

> looking first at the child's actual functioning in all activities and settings and considering all domains that are involved in doing those activities, accounts for the interactive and cumulative effects of the child's impairment(s), including any impairments that are not "severe."  This is because limitations in a child's activities will generally be the manifestation of any difficulties that result from the impairments both individually and in combination.

The ALJ never addressed this issue.  She also failed to take notice of what Dr. Schwartz said on the matter.  Without acknowledging his testimony, it is difficult to understand how she could have considered the possibility that M.A.'s sleep disorder could have accounted for at least some of his functioning.  That could have included, for example, M.A.'s

testimony to the ALJ that he falls asleep in class.

The Commissioner points out that Dr. Schwartz went on to say that sleep problems in children are easily treated. That does not account for the effects of M.A.'s condition, however, because his sleep disorder was *not* treated between his alleged onset date and the hearing. Moreover, Dr. Charo's report cited a number of follow-up recommendations. These included further studies for "possible narcolepsy with history of cataplexy, hypnagogic hallucinations without any sleep paralysis." (R. 369). Additional testing was recommended if M.A. was diagnosed with narcolepsy. Thus Dr. Charo himself does not appear to have been satisfied that M.A.'s sleep test satisfactorily accounted for the full extent of his problems. The ALJ should have explained more carefully why she did not believe that the issue required further discussion.

### E.   The Functional Equivalence Analysis

Finally, Alexander argues that the ALJ failed to discuss M.A.'s functional equivalence properly because she did not consider the medical experts or M.A.'s teachers with sufficient care. She also claims that the ALJ's domain statements contain no supporting explanations. It true that the ALJ decided the six functional domains by stating what limitation existed without providing any discussion. That was unhelpful, but it was not necessarily erroneous. An ALJ's decision must be read as a whole. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004). The broader question is how the rest of the ALJ's decision supports her domain conclusions.

The Court agrees that the ALJ's errors related to the teachers and medical experts require her to reconsider her functional analysis. The reasons supporting that conclusion are laid out above. That said, the issue also involves an exceptional number of difficulties

stemming from the ALJ's confusing account of M.A.'s impairments.

The first involves the question of what it was that the ALJ thought she was evaluating as part of the Step 3 discussion. The purpose of a functional equivalence analysis is to determine if a child's "impairment" functionally equals a listing. The regulations for each of the six domains of functioning clearly state that "your limitations must result from your medically determinable *impairment(s)*." 20 C.F.R. § 416.926a(g)(3) (emphasis added). *See also Jefferson v. Barnhart*, 356 F. Supp.2d 663, 671 (S.D. Tex. 2004) ("To determine whether an impairment is functionally equivalent to a listing, the ALJ must determine that an impairment results in" specified marked or extreme limitations). A functional equivalence analysis is not required for a non-existent impairment.

The problem in this case is that the ALJ never identified an impairment related to M.A.'s school performance, including the domains of acquiring and using information and attending and completing tasks. She gave every indication that no such impairment even existed. (R. 69, "While claimant alleged that he is doing poorly in school, Dr. Schwartz's testimony reflects that there is no medical basis for his problems."). She concluded that M.A.'s only severe impairment was right eye optic nerve dysplasia. The only non-severe impairments were left eye myopia, sleep apnea, and asthma. The ALJ,however, never linked these impairments to M.A.'s domains of functioning. Dr. Schwartz never stated that M.A.'s problems in the first two domains stemmed from these issues. The Court can only conclude that the ALJ conducted a functional equivalence analysis for medically determinable impairments that she did not identify, and which she plainly suggested did not exist.

Part of the confusion stems from the fact that the ALJ misconstrued Dr. Schwartz's

testimony. The ALJ said that Dr. Schwartz dismissed Dr. Karr's diagnoses of borderline intellectual functioning and a learning disability because his report did not show a discrepancy between "achievement testing and IQ testing." (R. 20, 70). Thus she gave great weight to the proposition that M.A. did not suffer from borderline intellectual functioning despite the fact that Dr. Karr assessed an IQ score of 74 based on an objective IQ test. (R. 325). *See Tagger v. Astrue*, 536 F. Supp.2d 1170, 1180 (C.D. Cal. 2008) ("Borderline intellectual functioning means an I.Q. within the 71-84 range[.]").

The difficulty is that Dr. Schwartz never said all that the ALJ attributed to him. He only stated that Dr. Karr's report failed to substantiate the existence of a learning disability, not borderline intellectual functioning. (R. 20, "I'm not quite sure where that came from because [a] learning disability is diagnosed by discrepancy between achievement and IQ testing."). Indeed, Dr. Schwartz went on to assess borderline intellectual functioning under listing 112.02 as a "cognitive deficit."[4] (R. 24-25). Borderline intellectual functioning is well-recognized as a serious nonexertional impairment. *See*, *e.g.*, *Byes v. Astrue*, 687 F.3d 913, 916 (8th Cir. 2012) (citing cases). The ALJ should have realized that Dr. Schwartz would not have addressed listing 112.02 unless he believed there was an impairment that required analysis. This means that the ALJ incorrectly accounted for what Dr. Schwartz stated, claimed that no medical impairment existed to explain M.A.'s mental functioning, then went on to assess the functional equivalence of an impairment she never identified.

---

[4] The fact that M.A.'s borderline intellectual functioning did not meet the listing is separate from the issue of whether it functionally equaled it. An ALJ only moves to a functional equivalence analysis when the impairment does not meet or medically equal a listing.

With this confusing background in mind, the Court turns to the ALJ's brief analysis of the first two functional domains. The ALJ and Dr. Schwartz both thought that M.A. had a marked impairment in acquiring and completing tasks. The ALJ failed to build a logical bridge between the evidence and her conclusion. The Commissioner claims that she relied on M.A.'s school achievement, learning difficulty, and cognitive functioning. (Resp. at 12). Unfortunately, the ALJ never said that was the case. She only said that M.A. had "ongoing difficulties in school" and that "there is [an] indication of limitation." (R. 70). She never explained what those vague comments included, or how they were related to any specific domain of functioning. Her reference to an "indiction of limitation" is merely a conclusion. It does not identify an impairment or explain its limiting effects. As discussed above, the ALJ overlooked much of the trouble that M.A. had in school, particularly his poor grades. Thus it is not clear what the ALJ thought was the true basis of M.A.'s limitations in the first domain. Without that, it is not possible to assess how she determined that his restriction was "marked."

The ALJ recognized that Dr. Schwartz assessed the same first domain limitation for M.A. as she did. Yet she again misunderstood the basis of his reasoning. The ALJ stated that Dr. Schwartz based his finding on "learning difficulty, problem in cognitive communication, and based on his achievements." (R. 70). Dr. Schwartz actually concluded that M.A. had a marked limitation in the first domain based on "the learning evidence and with the borderline intellectual [functioning]." (R. 25). The ALJ, of course, never found borderline intellectual functioning to be a severe or non-severe impairment, and she did not recognize that Dr. Schwartz relied on it. Her oversight in the first domain may have only been harmless error in light of Dr. Schwartz's ultimate conclusion. Since

28

the case already requires remand, however, the ALJ should clarify the basis of her reasoning on the issue.

The second domain presents more serious problems. Neither the ALJ nor Dr. Schwartz carefully identified what it was that they were functionally assessing in the domain of attending and completing tasks. Dr. Schwartz vaguely referred to "the fact that he's not as swift cognitively as [other children]." (R. 26). He explicitly excluded ADHD, which he did not think existed.[5] The ALJ only cited "cognitive limitations." (R. 70). Neither the ALJ nor Dr. Schwartz stated whether this involved M.A.'s borderline intellectual functioning, a learning disability, or the combined effect of all of these and other issues.

As a result it is extremely difficult to discern what the ALJ was considering in the second domain, or what evidence she actually relied on to reach her decision. Part of the problem stems from the ALJ's flawed consideration of Dr. Karr and the state-agency physicians. Dr. Pilapil and Dr. Travis agreed that M.A. had ADHD, borderline intellectual functioning, and a learning disability. The ALJ could not properly assess the second domain without identifying what M.A.'s impairments were and giving reasons why they did or not limit him.

The ALJ said that she evaluated M.A. by using the "whole child" approach to childhood disability. A whole child analysis emphasizes that an impairment or combination of impairments "may result in limitations that require evaluation in more than one domain." SSR 09-1p. Social Security Ruling 09-3p reinforces that point. It notes that "[c]hildren who

---

[5] He seems to have thought that M.A.'s limitations were not severe enough to be explained by ADHD. (R. 26, "But it's not that the degree that a diagnosis of attention deficit disorder would support."). Since Dr. Schwartz did not think M.A. even had ADHD, the point would appear to have been moot.

have limitations in the domain of "[a]cquiring and using information" may also have limitations in other domains. For example, mental impairments that affect a child's ability to learn may also affect a child's ability to attend or to complete tasks."

Contrary to her claim, the ALJ never explained why M.A.'s limitations in the first domain did not restrict him more severely in the second. She also never cited anything in the record that supported the distinction she made between M.A.'s ability to acquire information and his capacity to pay attention. The issue was important because M.A.'s teachers thought that the first and second domains were interrelated. Ms. English said that M.A. was restricted in attending and completing tasks "because of his lack of understating." (R. 235). She also attributed his problems in acquiring information to his "problem with staying focused." (R. 234). Ms. English further reported that M.A. had very serious problems on an hourly basis in paying attention when spoken to; focusing and re-focusing; carrying out single and multiple-step instructions; organizing his school materials; completing homework and school assignments; and working at a reasonable pace. (R. 235). Some of these findings are specifically identified in SSR 09-4p and the regulations as examples of significant restrictions in attending and completing tasks.

As discussed earlier, the ALJ realized that Ms. English and Ms. Vaughan expressed concerns about M.A.'s "very serious" problems in attention. However, she dismissed them on the ground that M.A.'s "inability to perform school work is the reason behind his poor grade[s]." (R. 70). This was the only specific reference to the record the ALJ made as part of the second domain issues. Yet it explains nothing meaningful about M.A. for the reasons discussed earlier. The ALJ's task was to address what this difficulty involved. Was

it borderline intellectual functioning?  ADHD?  Sleepiness?  Dr. Kass's learning disability?  Or was it, as the ALJ implied, not really a problem at all because no medical impairment existed?  And how could M.A. have a less than marked limitation when his teachers forcefully stated otherwise?  The Court does not suggest that the ALJ was bound by the teacher reports, or that she could not have reached the decision she did.  The point is that she could fail to explain her reasoning in at least minimal form.[6]

Finally, the ALJ did not explain the basis of her belief that M.A. was functioning in an age-appropriate manner.  She was required to compare his functioning to that of non-disabled children his age.  The ALJ's flawed reasoning concerning M.A.'s ability to go on Facebook, make a sandwich, and microwave tea was discussed earlier.  Her reliance on the fact that he was not in special education classes was also troubling for the reasons stated above.  Among other things, it overlooked that M.A. received far more D's and F's than the B and C she cited.

The ALJ concluded that M.A. "is performing at grade level."  (R. 69).  That is surprising in light of his poor grades.  It also overlooked that M.A. was reading at the second-grade level when he was in the sixth grade.  (R. 235).  The ALJ never noted that problem.  The regulations lay out examples of age-appropriate skills that a child should be able to use in attending and completing tasks.  20 C.F.R. § 416.926a(h)(2).  These include

---

[6]  She also failed to address the issue of M.A.'s numerous absences from school. Dr. Schwartz drew a link between M.A.'s large number of absences from school and the second domain, stating that "[o]bviously, [if] you don't go into class, you're not going to learn, and you're not going to pay attention."  (R. 23).  Dr. Schwartz also stated that M.A.'s "performance in school is clearly affected by the number of absences he's had."  (R. 25). He suggested that a psychologist might bring a different perspective to the issue than a medical doctor.  (R. 25).  The ALJ is directed to consider the issue more carefully on remand.

the child's ability to read.  A child between six and 12 should be able to "read by [him]self;" older children should "maintain [their] concentration while reading textbooks."  20 C.F.R. § 416.926a(h)(2)(iv) & (v).  Even if the ALJ thought that his poor reading skills were related to the first domain, the whole child approach required her to consider what effect that limitation had on the second domain.  Social Security Ruling 09-2p states that an ALJ considering a child's restrictions must "analyze and evaluate relevant  evidence for consistency, and resolve any inconsistencies that need to be resolved."  The ALJ could not have compared M.A.'s functioning to non-impaired children his age without first recognizing that his reading level was four grades behind what was expected of him.

## IV.  Conclusion

For the reasons stated above, Plaintiff's motion for summary judgment [14] is granted. The ALJ's decision is reversed, and this case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  It is so ordered.

ENTERED:

_____
    DANIEL G. MARTIN
United States Magistrate Judge

Dated: March 12, 2015.